938

NATIONAL CITIZENS COMMITTEE FOR BROADCASTING, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Elyria-Lorain Broadcasting Co., et al., Intervenors.

OWOSSO BROADCASTING COMPANY, INC., Petitioner,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

KSL, Inc., Intervenor.

NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondent,

KSL, Inc., Intervenor.

WJAG, INC., Petitioner,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

WHAS, Inc., Louisiana Television Broadcasting Corp., Intervenors.

The OGDEN NEWSPAPERS, INC., Petitioner,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

KSL, Inc., Intervenor (two cases).

DAILY TELEGRAPH PRINTING COMPANY, Petitioner,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

WHAS, Inc., Louisiana Television Broadcasting Corporation, KSL, Inc., Intervenors.

AMERICAN NEWSPAPER PUBLISHERS ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

KSL, Inc., Intervenor.

The BROCKWAY COMPANY, Petitioner,

v.

UNITED STATES of America and Federal Communications Commission, Respondents,

KSL, Inc., Intervenor.

GRAY COMMUNICATIONS SYSTEMS, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

KSL, Inc., Intervenor.

Nos. 75–1064, 75–1152, 75–1289, 75–1379, 75–1386, 75–1387, 75–1388, 75–1567, 75–1614 and 75–1618.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 17, 1976.

Decided March 1, 1977.

Frank W. Lloyd, III, with whom Charles M. Firestone and Henry Geller, Washington, D. C., were on the brief for petitioner in No. 75–1064.

Thomas H. Wall, Washington, D. C., with whom Suzanne Meyer, New York City, Jon H. Marple, B. Dwight Perry and Alan C. Campbell, Washington, D. C., were on the brief for petitioners in Nos. 75–1263 and 75–1387.

Lee Loevinger, Robert R. Bruce, James H. Sneed and Jonathan S. Kahan, Washington, D. C., were on the brief for petitioner in No. 75–1289. Martin Michaelson, Washington, D. C., also entered an appearance for petitioner in No. 75–1289.

Aloysius B. McCabe, Washington, D. C., with whom Michael Yourshaw and Arthur B. Hanson, Washington, D. C., were on the brief for petitioner in No. 75–1567 and intervenor American Newspaper Publishers Association in No. 75–1064.

John P. Southmayd, Washington, D. C., with whom Richard R. Zaragoza, Washington, D. C., was on the grief for petitioner in No. 75–1614.

Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., with whom Barry Grossman, Atty., Dept. of Justice, Washington, D. C., was on the brief for respondent, United States of America.

Werner K. Hartenberger, Counsel, F. C. C., Washington, D. C., for respondent F. C. C., Ashton R. Hardy, Gen. Counsel, F. C. C., Daniel M. Armstrong, Associate Gen. Counsel, Charles H. Bell, Jr., Willard R. Nichols and Sheldon M. Guttmann, Counsel, F. C. C., Washington, D. C., were on the brief for respondent, F. C. C. Joseph A. Marino, Gregory Christopher and Stephen A. Sharp,

Attys., F. C. C., Washington, D. C., also entered appearances for respondent F. C. C.

Ernest W. Jennes, Washington, D. C., with whom Russell H. Carpenter, Jr., Washington, D. C., was on the brief for intervenors The Washington Post Company and Post-Newsweek Stations, Capitol Area Inc., Nicholas W. Fels, Washington, D. C., also entered an appearance for intervenors The Washington Post Co., et al.

William J. Dempsey, Frederick H. Walton, Jr., and Christopher J. Reynolds, Washington, D. C., were on the brief for intervenor Belo Broadcasting Corporation.

Paul Dobin, Washington, D. C., was on the brief for intervenor Louisiana Television Broadcasting Corporation.

James E. Greeley and Lawrence J. Bernard, Jr., Washington, D. C., were on the brief for petitioner in No. 75–1152.

Richard Hildreth, Washington, D. C., was on the brief for petitioner in No. 75–1379.

R. Russell Eagan and Robert A. Beizer, Washington, D. C., were on the brief for petitioner in No. 75–1618.

Lee M. Mitchell, Washington, D. C., was on the brief for intervenor WHAS, Inc., in Nos. 75–1064, 75–1379 and 75–1387.

Glen A. Wilkinson, Robert W. Barker and William R. Loftus, Washington, D. C., were on the brief for intervenor KSL, Inc.

John H. Midlen and Dennis F. Begley, Washington, D. C., were on the brief for intervenors KNUJ, Inc., Michelson Media and The Post Company.

Louis J. Sirico, Jr., and Martin H. Rogol, Hartford, Conn., filed a brief on behalf of Public Interest Research Group, et al. as amici curiae.

Marcus Cohn, Paul Dobin and Martin J. Gaynes, Washington, D. C., entered appearances for intervenors Elyria-Lorain Broadcasting Co. and WEEU Broadcasting Co.

James P. Holden, Washington, D. C., entered an appearance for petitioner in Nos. 75–1686 and 75–1688.

William J. Dempsey and Christopher J. Reynolds, Washington, D. C., entered ap-

pearances for intervenors The Hearst Corporation and Scripps-Howard Broadcasting Co., et al.

James A. McKenna, Jr., Thomas N. Frohock and Steven A. Lerman, Washington, D. C., entered appearances for intervenors General Electric Broadcasting Co., Inc., Forward Communications Corporation, et al. and American Broadcasting Companies, Inc.

Peter D. O'Connell, Washington, D. C., entered an appearance for intervenors Lee Enterprises, Inc., et al.

William M. Barnard, Washington, D. C., entered an appearance for intervenors Houston Post Company, et al.

William J. Potts, Washington, D. C., entered an appearance for intervenor KUTV, Inc.

Frank U. Fletcher, Robert L. Heald and Marvin Rosenberg, Washington, D. C., also entered appearance for intervenors The Chronicle Publishing Company, et al.

Before BAZELON, Chief Judge, WRIGHT and ROBINSON, Circuit Judges.

Opinion for the Court filed by Chief Judge BAZELON.

1. In addition to the newspaper-television regulations, 47 C.F.R. § 73.636(c), which form the heart of this case, the Commission also promulgated similar regulations regarding newspaper-radio station combinations. *But see* note 18, *infra*, 47 C.F.R. §§ 73.35(c), 73.240(c). Two of the petitioners, WJAG, Incorporated and Owosso Broadcasting, Inc., operate radio stations and presumably challenge those regulations. Their briefs, however, merely incorporate by reference briefs filed by other parties which do not distinguish between the radio and television regulations. Our discussion, therefore, will pertain equally to both sets of regulations.

The *First Report and Order* in Docket 18110, 22 F.C.C.2d 306 (1970), proscribed the formation of new AM–FM combinations serving the same market and placed restrictions on the transfer of existing combinations. These regulations are not at issue in this appeal.

2. In addition to WJAG, Inc., and Owosso, briefs were filed by the following parties representing media interest: Daily Telegraph Printing Company (Daily Telegraph), Gray Communications Systems, Inc. (Gray), the Brockway Company (Brockway), National Association of Broadcasters (NAB), and American Newspaper Publishers Association (ANPA).

BAZELON, Chief Judge:

At issue are Federal Communications Commission regulations dealing with one aspect of media ownership concentration: newspaper-broadcast station cross-ownership. *Second Report and Order (Order)*, 50 F.C.C.2d 1046 (1974), *reconsidered* 53 F.C.C.2d 589 (1975).[1] In 1970 the Commission proposed rules entirely eliminating newspaper-broadcast affiliation in a common city of operation. Docket 18110, 22 F.C.C.2d 349 (1970). Following a lengthy rulemaking proceeding, the Commission issued the more limited ban challenged here by the National Citizens Committee for Broadcasting, the Justice Department and various media interests.[2] In relevant part, the rules:[3]

1) forbid the future formation or transfer of co-located newspaper-broadcast combinations[4];

2) preserve existing combinations except those in communities served by only one daily newspaper and one broadcast station encompassing the community with a city grade signal; in the latter cases, one of the interests must be divested within five years.[5]

3. The rules are codified at 47 C.F.R. §§ 73.35, 73.240, 73.636.

4. Both halves of a combination cannot be transferred to the same party except by inheritance, 50 F.C.C.2d 1046, 1076 (1975). A broadcast license will not be issued to a local daily newspaper; if a broadcast licensee acquires a daily newspaper in the city in which it is licensed, it must dispose of the station within one year. *Id.* at 1074–76, 1099–1107.

5. Several definitions and qualifications are important. "Ownership" is not limited to majority stock ownership but "includes actual working control in whatever manner exercised." 47 C.F.R. § 73.636 note 1 *et seq.* Noncommercial educational stations and college newspapers are not subject to the divestiture rules and their presence in a community does not exempt local monopolies from the rules. 47 C.F.R. § 73.-636(b), and note 10. "A daily newspaper is one which is published four or more days per week, which is in the English language and which is circulated generally in the community of publication." 47 C.F.R. § 73.636 note 10. A "city grade signal," the most intense under the Com-

Under the latter rule, roughly 90% of existing combinations are grandfathered. For the reasons expressed below, we affirm the prospective ban but vacate the rules dealing with existing combinations.

## I. THE RULEMAKING PROCEEDING AND ORDER

### A. *The Proceeding.*

The Commission has long been aware that concentrated ownership threatens the public interest in a diversified mass communications media. The Commission's first multiple ownership rules, adopted in the 1940's, prohibited any party from owning or controlling more than one broadcast station in the same broadcast service in the same

> mission's rules, provides a clear signal to the entire community to which the station is licensed. 47 C.F.R. §§ 73.685, 73.315, 73.188. The Commission chose not to use a grade A or grade B contour in determining the number of media voices in a community. A "grade A contour" is the line at which a good picture may be expected to be available for at least 90% of the time at the best 70% of receiver locations at the outer limits of that service area; a "grade B contour" is the line at which a good picture may be expected to be available for at least 90% of the time at the best 50% of receiver locations. *Clarksburg Publishing Company v. F.C.C.*, 96 U.S.App.D.C. 211, 225 F.2d 511, 516 n.12 (1955). For Commission policy on waivers and petitions to deny, *see* notes 19–21 *infra* and accompanying text.

6. Fed.Reg. 2382 (1940), 6 Fed.Reg. 2282 (1941); 8 Fed.Reg. 16065 (1943). About this time the Commission also adopted the "Chain Broadcasting" rules, designed to combat the growing power of networks. As a result of these rules, the National Broadcasting Company was required to divest one of its dual networks, which eventually became the American Broadcasting Company. Docket 5060, May 1941. The Supreme Court upheld the Commission's authority to promulgate these rules, noting that the Commission may call on antitrust policies in implementing its public interest mandate. *NBC v. United States*, 319 U.S. 190, 223, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). The Commission also conducted during the 1940's an inquiry into potential problems of newspaper and broadcast station cross-ownership, but decided at that time to control cross-ownership abuses on a case by case basis rather than by rule. 6 Fed.Reg. 1580, 3302 (1940); 9 Fed.Reg. 702 (1944).

7. 1945 FCC Annual Report at 2. The FM radio and VHF TV rules operated prospectively only.

area.[6] As a result of the AM radio rules, divestiture was ordered in 24 cases.[7] The rules have since been tightened several times, most recently in the early stages of Docket 18110 to prohibit the common ownership of more than one broadcast station of any type in the same service area.[8] The Commission enacted these rules without compiling a substantial record of tangible harm; it rested instead on its belief that "the effects of competition or its absence," are "not readily susceptible of quantitative ascertainments." 29 Fed.Reg. 7535, 7537, Docket 14711 (1967). The Commission has always viewed diversification as a factor of central importance in comparative license hearings.[9]

8. In 1953 the Commission imposed numerical limitations on the number of stations one individual could control, its authority being upheld in *United States v. Storer Broadcasting*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956). The multiple ownership rules were amended once again in 1964 to define precisely the standard for determining prohibited contour overlap. Multiple Ownership Rules, 2 Pike & Fischer RR 2d 1588 (1964).

9. In *McClatchy Broadcasting Co. v. FCC*, 99 U.S.App.D.C. 195, 239 F.2d 15, 18 (1956), for example, the court wrote, "In considering the public interest the Commission is well within the law when, in choosing between applications, it attaches significance to the fact that one, in contrast to the other, is disassociated from existing media of mass communication [newspapers] in the area affected," *quoting Sripps-Howard Radio, Inc. v. FCC*, 89 U.S.App. D.C. 13, 189 F.2d 677, 683 (1951). In its *1965 Policy Statement on Comparative Renewal Hearings*, the Commission concluded that diversification should be a primary factor in allocating contested broadcast assignments. The Commission wrote,

> Diversification of control is a public good in a free society, and is additionally desirable where a government licensing system limits access by the public to the use of radio and television facilities.

1 F.C.C.2d 393, 394. The Commission has applied the *1965 Policy Statement* in noncomparative hearings, although by its terms it is not applicable. *Seven League Productions, Inc.*, 1 F.C.C.2d 1597 (1965); *A. H. Belo Broadcasting Corp.*, 47 F.C.C.2d 540 (1974). *See generally, Comparing the Incomparable Towards a Structural Model for FCC Comparative Renewal Hearings*, 43 U.Chi.L.Rev. 573 (1976).

In 1970 the Commission broadened the scope of ongoing rulemaking proceedings, Docket 18110, to consider whether newspaper-broadcasting affiliation was in the public interest.[10] 22 F.C.C.2d 339. Citing figures indicating the high incidence of newspaper-television affiliation,[11] and the popular dependency on these media as information sources, the notice of proposed rulemaking stated that, as with two television stations, it is not "desirable that these two organs . . . be under the same control in any community." *Id.* at 344, 346. The Commission suggested that promotion of media competition and maximum diversification of media viewpoints might require the separation of all co-located newspaper-broadcast combinations. Since the Commission contemplated allowing divestiture to take place over five years under favorable tax treatment,[12] it expressed confidence that such a rule would produce no more than minimal economic losses. *Id.* at 347–48. Comments were invited.

Not surprisingly, the proposed rules generated considerable interest. Nearly 200 parties filed comments. In addition, roughly 25 major studies were lodged, *Order* at 1090–1094, although as will be explained in Section IV–A *infra*, the studies were of surprisingly little value.[13] In March 1974, the Commission requested additional comments dealing primarily with the central problem of newspaper-television cross-ownership. 45 F.C.C.2d 768. Forty eight parties filed fresh comments.[14] Three days of oral argument were held and the *Order* was released on January 31, 1975.

### B. *The Order.*

After summarizing the comments and studies filed in Docket 18110, the Commission explained its justification for the prospective ban. Although the Commission had at one time encouraged newspaper sponsorship of broadcast stations, it concluded this policy was no longer warranted because broadcast licenses had become attractive to other types of investors. It had come to believe that "any new licensing

**10.** Examination of newspaper-television station cross-ownership is a logical outgrowth of the Commission's ongoing concern with concentrated ownership. Apart from Docket 18110, the Commission has recently prohibited television networks from owning cable interests and telephone companies from operating cable systems in their service areas. *See Iacopi v. F.C.C.*, 451 F.2d 1142 (9th Cir. 1971); *General Telephone Co. of the Southwest v. United States*, 449 F.2d 846 (5th Cir. 1971). The Commission also considered ordering newspapers to divest their cable systems, *CATV Notice of Proposed Rulemaking and Inquiry*, Docket 18891, 23 F.C.C.2d 833 (1970), but ultimately decided not to do so, 52 F.C.C.2d 170 (1975).

**11.** At the time of the *Notice of Proposed Rulemaking*, there were 94 newspaper-television combinations, of which 34 were in the top 50 markets, and 52 in the top 100. 22 F.C.C.2d at 345. In 1975, 79 were still intact.

**12.** The Commission indicated it would certify divestiture sales under the favorable gains provision of section 1071 of the Internal Revenue Code of 1954, as amended. 26 U.S.C. § 1071. The Commission also theorized that swapping of affected stations would further minimize losses. 22 F.C.C.2d ˄t 347.

**13.** In its brief, the Commission characterizes the studies as generally "inconclusive or unrealistic." Br. at 9, n.6. Although it did not

state this opinion so baldly in the *Order*, it repeatedly criticized many of the individual studies. *See generally*, Note, *Media Cross-Ownership—The FCC's Inadequate Response*, 54 Tex.L.Rev. 336 (1976).

**14.** Amicus curiae, Public Interest Research Group et al., contend a remand is necessary because the Commission failed to develop an adequate "public interest" record. Only 2 of the original 200 comments and 6 of the subsequent 48 filings were filed by public interest groups. In light of our disposition of this case, we have no need to consider whether an agency has an affirmative obligation, not imposed by the Administrative Procedure Act, to seek out public interest comments. In any event, Docket 18110 was exceptionally well publicized. The Commission deferred all petitions to deny that alleged undue economic concentration until the docket was completed, calling further attention to the existence of the docket. *See, e. g., Hale v. F.C.C.*, 138 U.S.App.D.C. 125, 425 F.2d 556 (1971); *Stone v. F.C.C.*, 151 U.S. App.D.C. 145, 466 F.2d 316 (1972). And, unlike *NAITPD v. F.C.C.*, 502 F.2d 249, 258 (2d Cir. 1974), public interest groups actively participated in the proceeding. We would, of course, applaud any effort of the Commission to broaden the base of its rulemaking proceedings.

should be expected to add to local diversity," *Order* at 1075. Because granting a broadcast license to a local newspaper owner could not be expected "to enhance diversity," *id.*, the Commission decided to prohibit the creation of future combinations. However, a geographic limit was placed on this ban because "there is no basis in fact or law for finding newspaper owners unqualified as a group for future broadcast ownership." *Id.* Recognizing that various limits could be imposed, the Commission chose to employ the pattern used in earlier multiple ownership rules; the ban applies only if the station in question would or does encompass the common city with a city grade signal. *Id.* [15]

The Commission then focused on the more difficult question—what to do with existing co-located combinations. Initially, the Commission noted it had not yet paid sufficient consideration to certain possible side-effects of divestiture—reduction of local ownership, disruption of broadcasting continuity and local economic dislocations. *Order* at 1073. Claiming that stability and continuity of ownership serve the public interest, the Commission concluded that "a mere hoped for gain in diversity" was not adequate cause for disrupting ownership. Divestiture would be ordered "in only the most egregious cases." *Order* at 1080. In framing its *Order*, the Commission chose not to focus, as the Justice Department suggested, on competition for advertising, citing authority that it has discretion to determine the weight to be given antitrust principles in shaping its regulatory policy. [16] Instead, the Commission stated that the number of media voices serving a given area was a more important concern.

> If our democratic society is to function, *nothing can be more important* than insuring that there is a free flow of information from as many divergent sources as possible. . . .

*Order* at 1079 (emphasis added).

The Commission then explained a combination would be considered an "egregious case" if it had an "effective monopoly in the marketplace of ideas" with respect to local issues. Although the Commission stated it had examined "every" combination "known to us," *Order* at 1081, the record contained no evidence suggesting which combinations were monopolies in this sense. Instead, the Commission relied heavily on its experience, determining that a non-affiliated broadcast station encompassing the city of publication with a city grade signal could reasonably be expected to provide a sufficient additional voice on local matters, but that stations bathing the area with the weaker Grade A or Grade B signals could not. [17] Thus, the Commission ordered divestiture only where no other newspaper or city grade broadcast station was operating in the locality of the combination. [18]

**15.** *See* note 5 *supra.*

**16.** *Northern Natural Gas Co. v. F.P.C.*, 130 U.S. App.D.C. 220, 399 F.2d 953, 959 (1968) (citing cases). Earlier in the *Order*, however, the Commission stated that the prospective rules were based primarily on First Amendment concerns whereas the retroactive rules were based on both First Amendment and antitrust policies, *Order* at 1049.

**17.** For definitions of these contours, *see* note 5 *supra.* Several parties vigorously asserted that Grade A and Grade B signals should be considered in determining the number of effective media outlets because, under the Commission's local ascertainment rules, stations are obligated to consider the needs of those residing within those contours. Although conceding that a station has a secondary obligation to ascertain the needs of nearby communities, the Commission nonetheless observed that it would be unrealis-

tic to expect a station to give adequate attention to the local problems of areas on the margins of its contour. *Order* at 1082.

**18.** Divestiture was ordered in the cases of 7 out of 79 television-newspaper and 16 radio-newspaper combinations. In addition, a television-newspaper combination in Hickory, North Carolina, and a radio-newspaper combination in Brookfield, Missouri, fell within the divestiture requirement. But the Commission *sua sponte* granted waivers in each case. *Order* at 1085.

On one level, radio and television stations are treated equally under these regulations; divestiture is required if either type of station and an affiliated daily newspaper are the only media voices in the community. However, the existence of a city grade television station is sufficient to exempt a radio combination from divestiture, but the existence of a city grade radio station does not exempt a television combina-

As in its notice of proposed rule making, the Commission stressed that temporary or permanent waivers would be granted where appropriate because it did not intend to work a forfeiture through divestiture.[19] It made clear, though, it would not reconsider in waiver proceedings issues resolved in Docket 18110. *Order* at 1085.[20] Finally, the Commission indicated it did not intend to ignore antitrust considerations entirely, and would therefore continue to entertain petitions to deny on grounds of economic concentration. However, it tightened the requirements for granting such petitions, holding that it would set a hearing only when a violation of the Sherman Act was alleged. *Order* at 1088.[21]

The Commission reconsidered its regulations but did not materially alter them. 53 F.C.C.2d 589 (1975). The various petitioners then brought this appeal assailing the rules on numerous grounds.

The remainder of the opinion will be organized as follows, with the first page of each section being noted in parentheses.

II. Validity of the Prospective Ban (181 U.S.App.D.C. p. ——, 555 F.2d p. 947)

A. Whether the Prospective Ban Has a Rational Basis (181 U.S.App.D.C. p. ——, 555 F.2d p. 948)

B. Whether the Prospective Ban Exceeds the Commission's Authority (181 U.S.App.D.C. p. ——, 555 F.2d p. 951)

C. Whether the Prospective Ban Violates the First Amendment (181 U.S.App.D.C. p. ——, 555 F.2d p. 953)

III. Whether the Commission May Adopt Any Rule That Orders Divestiture Without an Evidentiary Hearing (181 U.S.App.D.C. p. ——; 555 F.2d p. 955)

IV. Validity of the Divestiture Rule Adopted by the Commission (181 U.S. App.D.C. p. ——, 555 F.2d p. 956)

A. Record Support for the Divestiture Order (181 U.S.App.D.C. p. ——, 555 F.2d p. 956)

B. Whether the Commission May Properly Require a Showing of Tangible Public Interest Harm to Support Divestiture (181 U.S.App.D.C. p. ——, 555 F.2d p. 961)

Conclusion (181 U.S.App.D.C. p. ——, 555 F.2d p. 966)

## II. VALIDITY OF THE PROSPECTIVE BAN

The Commission must allocate use of the public airways by granting renewable licenses of no more than three years in the "public interest, convenience and necessity." 47 U.S.C.A. §§ 301, 303, 309(a). Congress purposely left this mandate open-ended so that the Commission could fashion its regulations in light of changing conditions. *Federal Communications Commission v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656 (1940). In exercising its function, the Commission may enact eligibility standards for licenses. *United States v. Storer Broadcasting*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1955). Furthermore, the Commission may, under its authority to "encourage the larger and more effective use of radio in the public

---

tion. The difference in treatment is premised on the fact that television is the vastly more powerful medium.

**19.** Temporary or permanent waivers would be appropriate if, for example, it were impossible to sell one of the interests or if sale could only be accomplished at an artificially depressed price. *Order* at 1085.

**20.** In its *Reconsideration*, the Commission explained this point. A petition contending that in general, the presence of independent educational stations should exempt monopoly combinations from divestiture would not be set for hearing because that issue had been deter-

mined in the docket. On the other hand, a hearing would be set if the petition alleged that a particular educational station in fact was providing a community with an adequate additional voice. 53 F.C.C.2d at 235.

**21.** The Commission had previously considered factors such as the size, extent and location of areas served; the number of people served; the classes of stations involved; and the extent of other competitive service to the areas in question in passing on petitions to deny on grounds of economic concentration. 47 C.F.R. §§ 73.-53(b), 73.420(a)(2), 73.636(a)(2).

interest," 47 U.S.C. § 303(g), enact rules designed to curb potential abuses, *Metropolitan Television Co. v. F.C.C.*, 110 U.S.App. D.C. 133, 289 F.2d 874 (1961).

▆▆▆ Because the Commission has the primary responsibility for allocating use of the electromagnetic spectrum, a presumption of correctness attaches to its regulations. *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Of course, courts are not to rubber-stamp Commission regulations. On the contrary, review is to be "searching." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is especially so where the regulations touch on areas heavily laden with First Amendment interests.[22] Yet despite this care, courts are not to substitute their judgment for that of the Commission or review the facts de novo. With respect to the prospective rules, which reflect a legislative type policy judgment,[23] as opposed to the retroactive rules, which purport to be based also on factual considerations,[24] our primary task will be to ensure that the regulations are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In addition, we must examine the contentions that the rules exceed the Commission's authority and violate the First Amendment.

## A. Whether the Prospective Ban Has a Rational Basis

The licensing of speakers required by the Communications Act is unprecedented and has been justified under the First Amendment because of the scarcity caused by the physical limitations of the electromagnetic spectrum. The need for some regulation of the airwaves became clear in the 1920's when there was none. "With everybody on the air, nobody could be heard." *National Broadcasting Co. v. F.C.C.*, 319 U.S. 190, 212, 63 S.Ct. 997, 1008, 87 L.Ed. 1344 (1943). In order to ensure the public's ability to hear some speakers, the rights of other potential speakers were curtailed. The hard choice was between forcing free speech to bend or watching it break.

The licensing scheme was based on antitrust policies as well. It was feared that the conditions of scarcity would make broadcasting a natural monopoly so as to silence a diversity of opinion.[25] "Congress moved under the spur of a widespread fear that in the absence of governmental control the public interest might be subordinated to monopolistic domination in the broadcasting field." *F.C.C. v. Pottsville Broadcasting Co.*, 309 U.S. 134, 137, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940).

▆▆▆ The Commission has recognized that a policy of diversity is central to the Communications Act,[26] and it has denied

---

**22.** More intense review is appropriate when Commission regulations or decisions trench on Constitutional rights, such as free speech. The Commission's expertise does not extend to Constitutional interpretation. *National Broadcasting Co., Inc. v. FCC*, 170 U.S.App.D.C. 173, 516 F.2d 1101 (1974); *Yale Broadcasting Co. v. FCC*, 155 U.S.App.D.C. 390, 478 F.2d 594 (Bazelon, Statement as to why he would grant rehearing en banc), *cert. denied*, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973).

**23.** "The rules are not in the least premised on the existence of improprieties in the operation of the media holdings." *Order* at 1085.

**24.** The factual nature of the retroactive rules will not alter the intensity of review but only the direction it takes. *See* text and notes at notes 53–54 *infra*.

**25.** *See, e. g.*, Remarks of Senator Howell, during debates on Radio Act of 1927, the predeces-

sor act to the current Communications Act. 67 Cong.Rec. at 12503 (1926).

**26.** *See* 47 C.F.R. §§ 73–131–.138; .231–.240; .35; .658; 636 (1974); *Frontier Broadcasting Co.*, 27 F.C.C.2d 486 (1971). n*See also United States v. Midwest Video Corp.*, 406 U.S. 649, 665–670, 92 S.Ct. 1860, 1869–1871, 32 L.Ed.2d 390 (1972); *Metropolitan Television Co. v. FCC*, 110 U.S. App.D.C. 133, 289 F.2d 874 (1961); *Carter Mountain Transmission Corp. v. FCC*, 116 U.S.App. D.C. 93, 321 F.2d 359, *cert. denied*, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963); *Carroll Broadcasting Co. v. FCC*, 103 U.S.App.D.C. 346, 258 F.2d 440 (1958); *Simmons v. FCC*, 83 U.S.App.D.C. 262, 169 F.2d 670, *cert. denied*, 335 U.S. 846, 69 S.Ct. 67, 93 L.Ed. 396 (1948); *Chicagoland TV Co.*, 11 F.C.C.2d 119, 136–137 (1967) (Hearing Exam.); *See* Policy Statement on Comparative Broadcast Hearings, 1 F.C.C.2d 393, 394–396 (1965). Note, Diversifica-

licenses to otherwise qualified applicants on the strength of that policy.[27] Since denying access to the airwaves to some involves a substantial though at this time necessary, restriction of speech, it follows that the Commission acts properly when it attempts to promote diversity by allocating stations to those without control over an alternative major media voice. The Supreme Court has given its approval to a diversity policy based on First Amendment and antitrust considerations. The First Amendment "rest on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1944).[28] "The 'public interest' standard necessarily invites reference to First Amendment principles." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 122, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1972). In addition, even though the Commission does not enforce the antitrust laws, the Court has said the Commission may call on antitrust policies to promote diversity in giving content to the "public interest, convenience and necessity." *United States v. Radio Corporation of America*, 358 U.S. 334, 351, 79 S.Ct. 457, 467, 3 L.Ed.2d 354 (1958).

▮ Nevertheless there are limits to diversification policy.[29] One limitation is contained in the statutory and First Amendment commands that the Commission shall not censor.[30] The Supreme Court upheld the personal attack and political editorializing portions of the Commission's fairness doctrine in *Red Lion Broadcasting Co. v. F.C.C.*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968). Those rules were designed to invigorate public debate by requiring broadcasters to air responses to its

tion and the Public Interest: Administrative Responsibility of the FCC, 66 Yale L.J. 476 (1957).

It is judicially settled that the Commission may, indeed must, consider diversification of ownership in the licensing of broadcast frequencies. *Citizens TV Protest Comm. v. FCC*, 122 U.S.App.D.C. 50, 348 F.2d 56 (1965); *Clarksburg Publishing Co. v. FCC*, 96 U.S.App. D.C. 211, 225 F.2d 511 (1955). *See United States v. Midwest Video Corp.*, 406 U.S. 649, 665–670, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972); *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *Mansfield Journal Co. v. FCC*, 86 U.S.App.D.C. 102, 180 F.2d 28 (1950). *See also Pinellas Broadcasting Co. v. FCC*, 97 U.S.App. D.C. 236, 241, 230 F.2d 204, 209, *cert. denied*, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956) (Bazelon, J., dissenting); *Scripps-Howard Radio v. FCC*, 89 U.S.App.D.C. 13, 189 F.2d 677, *cert. denied*, 342 U.S. 830, 72 S.Ct. 55, 96 L.Ed. 628 (1951).

Unfortunately, the Commission has not always pursued its diversification policy with unrelenting vigor. *See Pinellas Broadcasting Co. v. FCC*, 97 U.S.App.D.C. 236, 251, 230 F.2d 204, 209, *cert. denied*, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956) (Bazelon, J., dissenting) H. Friendly, The Federal Administrative Agencies 66–67 (1962); Schwartz, Comparative Television and the Chancellor's Foot, 47 Geo.I.J. 655,

673–678, 690–694 (1959); *see also* H. Geller, A. Modest Proposal to Reform the Federal Communications Commission 3–12 (Rand Corp. 1974) (describing FCC policy on development of UHF and VHF bands). In addition, its inability to forestall trafficking in licenses has at times rendered diversification an empty gesture. *See generally Crowder v. FCC*, 130 U.S. App.D.C. 198, 201–202, 399 F.2d 569, 572–573, *cert. denied*, 393 U.S. 962, 89 S.Ct. 400, 21 L.Ed.2d 375 (1968), *aff'g Harriman Broadcasting Co.*, 9 F.C.C.2d 731 (1967); 47 C.F.R. § 1.597 (1973); *Moline Television Corp.*, 31 F.C.C.2d 263, 297–298 (1971) (Johnson, Comm'r., dissenting).

**27.** *E. g., McClatchy Broadcasting Co. v. F.C.C.*, 99 U.S.App.D.C. 195, 239 F.2d 15 (1956), *cert. denied*, 353 U.S. 918, 77 S.Ct. 664, 1 L.Ed.2d 665 (1957).

**28.** Although this statement was not made in a case reviewing FCC regulations, the Commission properly relied on it as support for its diversification policy. *Order* at 1050. The Court has referred to that language with approval in subsequent cases involving Commission regulations. *E. g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968).

**29.** Apart from those suggested in the text, any regulation must be able to withstand rational basis scrutiny.

**30.** 47 U.S.C. § 326 (1970).

programming in certain circumstances. The purpose of the rules is salutary.

> It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market.

395 U.S. at 390, 89 S.Ct. at 1806.

Nevertheless, the fairness doctrine may well mark the outer limits of a permissible diversification policy which relies on direct government control over the content of broadcast programs.[31] The *Red Lion* Court carefully withheld approval from rules that would more directly interfere with the broadcaster's First Amendment rights, such as one restricting a broadcaster from airing its own views. 395 U.S. at 367, 89 S.Ct. 1794.[32]

▋ In any event, the Constitutional difficulties with promoting diversity through speech restrictive means highlight the virtue of the prospective cross-ownership rules. The prospective ban is an attempt to promote diversity without government regulation of or supervision over speech. The rules attempt to promote vigorous public debate not by imposing restrictions on broadcasters, but simply by permitting more to be heard. Of course, there is no guarantee that the prospective ban will increase diversity in all cases, "the possible benefits of competition do not lend themselves to detailed forecast." *F.C.C. v. RCA Communications, Inc.*, 346 U.S. 86, 96, 73 S.Ct. 998, 1005, 97 L.Ed. 1470 (1952). But that does not make the attempt irrational.[33] It is not unreasonable for the Commission to assume that the licensing of an independent, rather than an affiliated station, offers greater hope of providing the community a new voice and to incorporate that assessment in its licensing policy. The First Amendment seeks to further the

---

**31.** Another limitation is contained in the factual predicate for licensing—scarcity. At present, in many cities the available broadcast spectrum is fully occupied. *See, e. g., Red Lion, supra*, 395 U.S. at 398 n. 25, 89 S.Ct. 1794. However, currently available technology could eliminate this scarcity. With existing equipment and technology "a single coaxial (tv) cable can carry between 28 and 36 channels of television, plus the entire AM and FM radio bands and a quantity of other nonvisual electronic signals." Smith, *The Wired Nation* 7 (1972). And in ten years it may be possible to provide each home with as many as 400 cable channels. *Id.* An innovation developed by the Bell System offers even more promise than conventional cable service. Developed primarily for telephone service, so-called "light-guides" made of broadband fiber optics have a capability of carrying 50,000 telephone calls or their equivalent on a cable one-half inch in diameter. One cable operator has begun experimental use of lightguides for television transmission, reportedly with excellent results. Broadcasting, July 19, 1976, 44.

Alleviating scarcity would not only eliminate the need for promoting diversity, it would also presumably eliminate the need for all licensing save that necessary to prevent interference. Of course, the expense required to produce quality programming and lay cable may limit the number of voices that in fact reach each home, but such constraints are common to many businesses. Broadcasting would no longer present unique problems requiring unique regulation. This conclusion to some extent assumes, however, as the Ninth Circuit has suggested, *ACLU v. FCC*, 523 F.2d 1344, 1351 (1975), that the Commission can compel cable systems to be common carriers, a matter which is not, of course, before us. *See also United States v. Midwest Video Corp.*, 406 U.S. 649, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). In any event, these hopes for the future do not diminish the importance of encouraging diversity today. This footnote reflects the views of only the author of this opinion.

**32.** Such a statute might be proposed to promote public debate. One way to attempt to equalize debate is by boosting the power of the weaker voice; another way is by reducing the power of the dominant one.

**33.** We also reject the argument that the prospective ban is arbitrary because it is based on one factor to the exclusion of others customarily relied on by the Commission. Courts are ordinarily uncomfortable with a claim that the "public interest" can be determined by reference to one, and only one factor. Here, however, the Commission has explained why it considers diversity to be a factor of exceptional importance and has anchored that explanation to Supreme Court decisions. Furthermore, forbidding the Commission from reasonably relying exclusively on one factor would prevent the Commission from enacting license qualifications, although it clearly has power to do so. *Storer Broadcasting, supra; FCC v. Allentown Broadcasting Co.*, 349 U.S. 358, 75 S.Ct. 855, 99 L.Ed. 1147 (1955).

"search for truth." Surely that search will be facilitated by government policy that encourages the maximum numbers of searchers.

### B. Whether the Prospective Ban Exceeds the Commission's Authority

■ The prospective rules, it is argued, cannot stand because, apart from their rationality, the Commission lacks authority to promulgate rules that restrict ownership of broadcast stations by newspapers. We hold that the prospective ban is within the Commission's rulemaking authority.

■ Although no provision of the Communications Act expressly grants the Commission authority to restrict newspaper ownership of broadcast stations, such express authority is not essential to the validity of Commission regulations.[34] 47 U.S.C. § 309(a) requires the Commission to find the "public interest, convenience and necessity will be served" by the grant of a license. 47 U.S.C. § 303(r) grants the Commission authority to make such rules and regulations "not inconsistent with law, as may be necessary to carry out" the Act while 47 U.S.C. 154(i) grants rule-making authority to make rules "as may be necessary in the execution of [the Commission's functions]."[35] In United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1955), the Supreme Court upheld a portion of the Commission's multiple ownership rules promulgated under these provisions.[36] In essence, Storer permits the Commission to codify in rule its understanding, if reasonable, of the public interest licensing standard. (See 351 U.S. at 202–03, 76 S.Ct. 763). Here, the Commission has determined the public interest would not be served by granting broadcast licenses to newspapers and in Section II–A we held this policy was reasonable. It requires no extension of Storer to conclude the Commission possessed statutory authority to impose the prospective ban.[37]

■ Storer aside, ANPA contends the Commission is disabled from enacting this rule because the Commission's first general counsel, Hampson Gary, was of the opinion that the Commission lacks the requisite statutory authority. In rejecting this contention, we need not determine what weight should be given to an agency's initial interpretation of its mandate[38] because Mr. Gary did not conclude that the Commission lacks statutory authority to enact a regulation restricting newspaper ownership. The question Mr. Gary addressed was whether "the Commission may deny an application of a newspaper for a license on the ground that it is against 'public policy.' "[39] After distinguishing "public policy" from the statutory standard of "public interest, convenience and necessity,[40]" he concluded that a license could not be denied on public

---

34. United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1967).

35. In addition, the Commission cited 47 U.S.C. § 152(a), and 154(j) in support of the regulations.

36. The regulations upheld in Storer placed a numerical ceiling on the number of broadcast stations a party could control.

37. The vitality of Storer is attested by its application in FPC v. Texaco, 377 U.S. 33, 39, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964), where the Court stated:
 [T]he statutory requirement for a hearing under § 7 does not preclude the Commission from particularizing statutory standards through the rule-making process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived.

38. See generally, 1 K. Davis, Administrative Law Treatise, § 506 (1958), (1970 Supp.).

39. Legal Opinion of FCC General Counsel Hampson Gary submitted to the Senate Interstate Commerce Committee, Jan. 25, 1937, at 1, J.A. 239 (emphasis added).

40. Mr. Gary defined "public policy" as:
 a term of vague and uncertain meaning, which it pertains to the law-making body to define, and courts are apt to encroach on the domain of that branch of government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Smith v. San Francisco & N.P.R. Co., 115 Cal. 584, 47 P. 582, 587 (1897).

policy grounds but that newspaper ownership could bear on the public interest. Mr. Gary did not consider, as would be relevant here, whether the Commission may enact license qualifications in the public interest.[41]

A more substantial argument is that this court already has decided the Commission lacks authority to restrict newspaper ownership of broadcast stations. The case relied on most strongly is *Stahlman v. F.C.C.,* 75 U.S.App.D.C. 176, 126 F.2d 124 (1942),[42] where after holding that an F.C.C. subpoena was supported by the Commission's general investigative powers, the Court wrote:

> [The Commission's power] does not embrace and should not be extended by implication to embrace a ban on newspapers as such . . . . This, we think, would be in total contravention of that equality of right and opportunity which Congress has meticulously written into the Act
>
> . . . .

126 F.2d at 127.

Although this language appears to resolve the question of statutory authority, in fact it does not. First, since the Commission had not then enacted a rule restricting broadcast ownership by newspapers, the issue of statutory authority was not before the court. Consequently, as Judge Edger-

ton pointed out in his separate concurrence, the quoted language is dicta. 126 F.2d at 128.

More significantly, the premise of the paragraph containing the quoted language is that "[t]he Communications Act requires no more of an applicant for a radio license than proof of citizenship, character, and financial and technical qualifications to operate in the public interest." *Id.* at 127. The next sentence implies that any applicant meeting these qualifications must be granted a frequency if one is available. However, this view of the Commission as a "traffic cop" of the airwaves was rejected by the Supreme Court the next year in *National Broadcasting Co., supra.* In order "to secure the maximum benefits of radio to all the people of the United States . . . Congress endowed the Communications Commission with comprehensive powers to promote and realize the vast potentialities of radio." 319 U.S. at 217, 63 S.Ct. at 1010. Thus *Stahlman* was based on a reading of the Communications Act that has not prevailed.[43]

In sum, *Storer* supports the Commission's exercise of rulemaking power and none of the materials cited requires a different conclusion.

---

**41.** ANPA also argues Congress has affirmatively declared the Commission lacks authority to ban newspaper ownership of broadcast stations. Between 1946 and 1952 Congress considered legislation that would have prevented the Commission from barring per se license applications from newspapers. Congress failed to enact the legislation, ANPA submits, because it believed the Commission lacked the authority in question so that the legislation would have been unnecessary.

Although this recitation of legislative history is less than persuasive, *see Order* at 56, we reject this argument on broader grounds. As the Supreme Court recognized in *United States v. Wise,* 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1961), the history of subsequent legislative activity is not useful in determining the meaning of the original legislation when enacted. "Statutes are construed by the courts with reference to the circumstances existing at the time of passage." *Id.* Otherwise, the meaning of a statute might never be settled, even though the statutory language had never been changed or reenacted with a different intent. Nor do the rules under review involve regulation of an industry over which the Com-

mission lacks jurisdiction. The prospective ban simply imposes qualifications for broadcast licensees. It does not impose regulations on the conduct of the newspaper industry.

**42.** One pre-*Stahlman* case was also relied on. In *Tri-State Broadcasting Co. v. FCC,* 68 U.S.App.D.C. 292, 96 F.2d 564 (1938), the court wrote it knew of no rule or statute prohibiting a newspaper from owning a radio station. As the Commission stated in its *Order,* "We fail to see how this justifies a ban on promulgating such a rule." *Order* at 1051.

**43.** *Stahlman* was cited with approval in *McClatchy Broadcasting Co. v. FCC,* 99 U.S.App.D.C. 195, 239 F.2d 15 (1956), *cert. denied,* 353 U.S. 918, 77 S.Ct. 664, 1 L.Ed.2d 665 (1957), where the court held the Commission could attach decisive significance to media diversification in a comparative renewal hearing where the applicants were indistinguishable on the basis of the Commission's other comparative criteria. The court did not consider whether the Commission could, *if it chose to,* base a rule exclusively on diversification.

## C. Whether the Prospective Ban Violates the First Amendment

It is argued that the prospective ban unconstitutionally conditions the First Amendment right to publish a newspaper.[44] It is not argued, as indeed it could not be, that the ban violates the First Amendment rights of newspaper owners as would-be broadcasters. Denial of a license application does not abridge the applicant's First Amendment rights. *F.R.C. v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933), *National Broadcasting, supra*, 319 U.S. at 226, 63 S.Ct. 997. "No one has a First Amendment right to a license or to monopolize a radio frequency; to deny a station license because 'the public interest' requires it 'is not a denial of free speech.'" *Red Lion supra*, 395 U.S. at 389, 89 S.Ct. at 1806, quoting *National Broadcasting*, 319 U.S. at 227, 63 S.Ct. 997. Of course, it does not follow that the First Amendment has no role in the licensing system. The Commission may not use the licensing process as a censoring mechanism, choosing those applicants whose views it favors.

> Congress did not authorize the Commission to choose among applicants upon the basis of their political, economic or social views . . . If it did, or if the Commission by these Regulations proposed a choice among applicants on some such basis, the [First Amendment] issue before us would be wholly different.[45]

*National Broadcasting*, 319 U.S. at 226, 63 S.Ct. at 1014. But no claim of censorship can be made here. The Commission has only decided that the public interest is better served by assigning available broadcast frequencies to those without a co-located major media voice.

Freedom of the press does not necessarily shield newspaper publishers from regulation that may make publication more difficult. A newspaper could not, for example, plausibly claim the federal income tax violates the First Amendment because payment of the tax makes publication more difficult, or perhaps impossible. *See Associated Press v. United States, supra*. So the question presented is not whether the prospective ban burdens newspapers—it clearly may do so—but rather whether there is something special about the burden that renders it unconstitutional. The relevant case law does not support such a contention.

In *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the Supreme Court held unconstitutional a state tax on net receipts imposed only on newspapers with weekly circulations of over 20,000. Justice Sutherland, writing for the Court, likened the tax to those imposed by the British on the American colonies in order to suppress dissent. *Id.* at 246–49, 56 S.Ct. 444. The tax was bad, he wrote because it was "a deliberate and calculated device . . . to limit the circulation of information to which the public is entitled." *Id.* at 250, 56 S.Ct. at 449. Here, the purpose of the Commission's prospective regulation is precisely the opposite.[46] The rule is intended and reasonably designed to increase the diversity of information and opinion circulated by increasing the number

---

**44.** It was also argued in the briefs that the prospective ban violates equal protection. This argument was based primarily on *Morey v. Dowd*, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), which was overruled between filing of the briefs and argument, *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511. At argument, counsel noted this fact and evidently abandoned the equal protection argument. In any event, we see no merit in it. As explained in Section II–A, *supra*, there is a rational basis for the rule, and, as this section makes clear, strict scrutiny is not required because the ban does not trench on protected First Amendment interests.

**45.** *See also*, 47 U.S.C. § 326; *Red Lion*, 395 U.S. at 390, 89 S.Ct. 1794; *Brandywine-Main Line Radio v. FCC*, 153 U.S.App.D.C. 305, 473 F.2d 16, 63 (Bazelon, C. J., dissenting); Kalven, *Broadcasting and the First Amendment*, 10 J. Law & Econ. 15, 43–44.

**46.** *Grosjean* may be a shaky precedent because it seemingly calls for judicial inquiry into the legislature's intent. *United States v. O'Brien*, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1967). This is less difficult with respect to agency regulations because agencies must provide a statement of the regulation's purpose. 5 U.S.C. § 554(c).

of media voices in the community. Neither *Grosjean* nor the other cited cases are controlling.[47]

■■■ The ANPA admonishes us to heed the warning uttered by the Supreme Court in *Miami Publishing Co. v. Tornillo*, 418 U.S. 241, 256, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974);

Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitation . . . *Id.* at 256, 94 S.Ct. at 2839.

However, a restraint is not unconstitutional merely because it is unfamiliar. Unable to claim the ban violates their First Amendment rights as would-be broadcasters, petitioners have not demonstrated the ban trenches on the constitutionally protected interests of newspaper publishers.[48] The ban neither mandates nor prohibits what may be published. It only forbids the formation of co-located combinations the Commission has determined do not serve the public interest. Of course, in serving the public interest the ban may indirectly affect the economics of publication, but the First Amendment does not provide a shield against this. *Associated Press*, 326 U.S. at 20, 65 S.Ct. 1416.

In fact, the very claim of constitutional abridgement is ironic. First of all, the prospective ban is an attempt to enhance the diversity of information heard by the public without on-going government surveillance of the content of speech. Second, it may be that newspapers can not truly be free of government interference so long as they operate government licensed broadcast stations. An unsavory fact of life is that government has the power to regulate expression by a "raised eyebrow" reminding the broadcaster of the triennial government renewal process. A newspaper opens itself up to similar intimidation by affiliation with a broadcast station.[49] "It would be strange indeed, however, if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. . . ." *Associated Press*, 326 U.S. at 20, 65 S.Ct. at 1424.

\* \* \* \* \* \*

In conclusion, we affirm the validity of the prospective ban. We find that the ban is a rational attempt to promote the highly valued goal of diversity, that it is within the Commission's authority and that it does not violate the Constitution. We now turn to the issues regarding the Commission's treatment of existing combinations. How-

47. *Oklahoma Press Publ. Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1945), is mistakenly cited for the proposition that legislation can never single out newspapers for special treatment. In fact, that issue was never reached. The case held, largely on the authority of *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), that the Fair Labor Standards Act could be applied to any business, including newspapers. After noting the First Amendment does not forbid regulations which do not restrain expression, the Court said the case did not involve the issue of special treatment raised in *Grosjean*. And an argument based on *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), also fails. *Speiser* involved a statute that conditioned a property tax exemption on the signing of a loyalty oath. The statute was invalidated not because it conditioned the exemption on the oath, but because the oath proscribed constitutionally protected speech. This was held to be a penalty for engaging in free speech. The prospective ban, however,

does not regulate let alone punish any speech and thus is not invalid under *Speiser*.

48. The principle of least restrictive alternatives, it is also argued, precludes the Commission from imposing a flat ban on future combinations. This argument contains a useful insight, but misapplies it. Systematic licensing of speakers itself severely strains free speech. Thus it is entirely appropriate for the Commission to attempt to restrict the access of the smallest possible number. Arguments that the ban is an unconstitutional prior restraint or overbroad are also unpersuasive.

49. "The main, main thing is The Post is going to have damnable, damnable problems out of this one. They have a television station . . . . And they're going to have to get it renewed." Taped Statement of Richard Nixon to H. R. Haldeman and John Dean, Sept. 15, 1972, quoted in Senate Select Comm. on Presidential Campaign Activities, Final Report. S.Rep.No.981, 93d Cong., 2d Sess. 149 (1974).

ever, before considering whether the divestiture scheme actually ordered by the Commission can be upheld, we must evaluate the arguments that the Commission may not enact any rule that orders divestiture without an evidentiary hearing.

III. WHETHER THE COMMISSION MAY ADOPT ANY RULE THAT ORDERS DIVESTITURE WITHOUT AN EVIDENTIARY HEARING

■ From the premise that divestiture, as retroactive legislation, is inherently suspect, it is argued that divestiture is permissible only if Congress specifically intended for the Commission to enact retroactive rules and only where, quoting from the *Order* at 1083, "the need is overwhelming and the evidence is unambiguous." [50] This argument fails in light of *American Airlines, Inc. v. Civil Aeronautics Board*, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966), where in upholding CAB regulations that affected existing licenses, this court en banc rejected an argument "that the *Storer* doctrine is restricted to regulations affecting applications for new licenses or certificates . . . ." *Id.* at 628. The court said "such rule making is not to be shackled, in the absence of clear and specific Congressional requirement." *Id.* at 629. Authority to order divestiture follows not only from the fact that *American Airlines* is based on

*Storer Broadcasting*, which interpreted the Communications Act, but also from the fact that the interest in a broadcast license is limited and conditional. A licensee must apply for renewal of authority every three years, and the renewal application is subject to such rules and conditions as are in effect, not during the license period, but at the time of the renewal. *Transcontinent Television Corp. v. F.C.C.*, 113 U.S.App.D.C. 384, 308 F.2d 339 (1962). Consequently, the contention that divestiture contains elements common to suspect retroactive legislation goes not to the existence of Commission authority, but rather to the reasonableness of its exercise.[51]

Section 309(e) of the Act, 47 U.S.C. § 309(e), requires the Commission to grant an applicant a hearing if unable to make the public interest finding required to grant a license. NAB advances the argument, seemingly foreclosed by *Storer* and *National Broadcasting*, that a divestiture rule violates the statutory right to a hearing. Although it is not entirely clear, the basis of this argument appears to be that *Storer* and *National Broadcasting* apply only to potential licensees not existing ones. However, as *American Airlines* suggests, these cases are not dependent on a distinction between current and potential licensees and nothing presented to us suggests why this distinction should be read into them.[52] Further-

50. This argument is made even though past divestiture orders have been approved under ordinary standards of review. In addition to the divestiture ordered as a result of the multiple ownership rules enacted in the 1940's, *see* text and notes at notes 6–7, *supra*, the Commission has adopted rules prohibiting networks from having cable interests and telephone companies from owning cable systems in their service areas. In *Iacopi v. FCC*, 451 F.2d 1142, at 1147 (9 Cir. 1971), the Ninth Circuit discussed the network cable divestiture rule with approval and in *General Telephone Co. of the Southwest v. United States*, 449 F.2d 846 (5 Cir. 1971), the Fifth Circuit affirmed the telephone cable divestiture rule.

51. It may be that Commission licensing rules are valid only if they contain waiver provisions. In *Storer* the Court quoted with approval language from *National Broadcasting* that "The Commission provided that 'networks will be given full opportunity, on proper application

. . . ., to call to our attention any reasons why the principle should be modified or held inapplicable.' " 351 U.S. at 205, 76 S.Ct. at 771, quoted 319 U.S. at 207, 63 S.Ct. 997. It is not clear whether the Court saw the waiver provision as necessary for affirmance or simply as evidence of reasonableness. In any event, there is every reason to believe that any divestiture order of the Commission will be accompanied by an appropriate waiver provision.

52. This Court's decision in *Citizens Communication Center v. FCC*, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971) does not forbid the Commission from ever denying a license without a hearing. In *Citizens*, the Commission's policy statement on comparative hearings was invalidated because it improperly denied a full hearing to qualified license challengers. The *Citizens* court carefully distinguished its disapproval of a policy of denying hearings to qualified applicants from *Storer's* approval of deny-

more, divestiture would not be as harsh as denial of license renewal. A licensee facing divestiture is compensated for its loss. A licensee that fails of renewal is not.

While recognizing that the Commission has broad discretion to proceed by rulemaking or adjudication, and that it may affect the rights of individual licensees without first holding an evidentiary hearing, Gray Broadcasting argues that the Commission abused its discretion by ordering divestiture without affording affected parties a prior evidentiary hearing. Gray contends the Commission has couched as rulemaking a proceeding that in "substance and effect is individual in impact," in other words an adjudication. The APA defines rule as "any agency statement of general *or particular applicability* and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 501(c). Professor Davis points out that the words "or particular" were inserted after Senate passage "to assure coverage of rule making to named persons." *Davis, 7 Administrative Law* § 5.02 (1958). The nature of the evidence required to implement a rule, and not the particularity of application, determines the necessity for individualized hearings. Given our disposition of the case, however, we need not determine whether a divestiture order limited to the seven affected licensees could have been implemented without individualized hearings.[53]

In sum, the Commission has authority to promulgate a rule that orders divestiture. An altogether different question, to which we now turn, is the reasonableness of the scheme under review.

## IV. VALIDITY OF THE DIVESTITURE RULE ADOPTED BY THE COMMISSION

Since the Commission purported to limit divestiture to "egregious cases" of

"effective monopoly," we must examine the record support for this determination. *Greater Boston Television Corp. v. F.C.C.,* 143 U.S.App.D.C. 383, 444 F.2d 841, 850 (1970). The purpose of our review is only to determine whether the agency decision is rational and based on consideration of the relevant factors, *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 146, 91 S.Ct. 814; *Bowman Transportation v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); whether, in terms of the APA, the agency decision is arbitrary and capricious. 5 U.S.C. § 706(2)(A). Technically, there is no requirement that the rules be based on substantial evidence. Cf. 5 U.S.C. § 706(2)(E). Nevertheless, a decision must be considered "arbitrary and capricious" if the facts on which it is purportedly based are not supported by the record. *Associated Industries of New York State, Inc. v. U. S. Dept. of Labor,* 487 F.2d 342, 349–50 (2d Cir. 1973) (Friendly, J.). Factual certainty is not necessary, though. An agency may regulate even though the facts do not illuminate a clear path. *Ethyl Corporation v. EPA,* 176 U.S.App.D.C. 373, 541 F.2d 1 (1976). But it stands to reason that presumptions derived from the enabling statute and fundamental national policies take on redoubled importance where this is so.

### A. Record Support for the Divestiture Order

The voluminous record of the lengthy rulemaking proceeding contains little reliable "hard" information. Many filings are devoted to legal argument or representations that the editorial staff of the filer's newspaper and television station are inter-

---

ing hearings to unqualified applicants. 447 F.2d at 1212, n. 34. As Section II makes clear, it is reasonable for the Commission to consider newspapers as "unqualified" to acquire licenses in the city of publication.

**53.** Implementation of certain divestiture rules might require individual evidentiary hearings. If, for example, the Commission were to adopt

on remand a policy of requiring divestiture where combinations have over 30% of the market in the community of operation, it would presumably be necessary to determine the market shares of given combinations by hearing. Across-the-board divestiture could, on the other hand, be implemented without hearings, apart from waiver proceedings.

nally segregated. In addition, roughly twenty-five major studies were submitted.[54] However, as the Commission brief points out, the studies were largely inconclusive. Br. at p. 9.

We summarize the record only to the extent necessary to show that in determining its divestiture policy, the Commission necessarily had to rely primarily on policy, not factual considerations.[55]

### (1) Effect of Common Ownership on Station Performance

Several studies attempt to demonstrate either that newspaper ownership of television stations has not harmed the public interest or, affirmatively, that newspapers have been superior broadcast licensees. The Anderson study [56] is largely of the former variety. It attempts to compare patterns of content under different ownership conditions to determine if cross-ownership produces "repressive information control," evidently on the assumption that the purpose of diversity policy is to combat such repression. The study finds no significant difference in content between individually and cross-owned stations in the sample cities and concludes divestiture is unnecessary.[57] Although the study has an objective format, it is based on content analysis that necessarily entails subjective judgments.[58]

The Litwin and Wroth study,[59] commissioned by the NAB, compares media performances in highly concentrated and relatively unconcentrated cities. Relying on information acquired in interviews, it finds that cross-owned stations are perceived to provide greater amounts of news coverage in greater depth than individually owned stations. In part, it attributes this superiority to greater financial stability. However, the interviewers only polled high-ranking "media personnel" and "business and community leaders." [60] Furthermore, the difficulties with an approach based on popular perceptions is highlighted by the fact that the study reports a pervasive history of news distortion and bias in one of the three highly concentrated cities examined.[61]

The Commission undertook a study [62] that compares the performance of cross and individually owned stations, but without making judgments based on content analysis. A complex multiple regression analysis finds that cross-owned stations present "6% more local news, 9% more local non-entertainment, and 12% more total local including entertainment than do other TV stations." This study, the *Order* concludes, shows "an undramatic but nonetheless statistically significant superiority in newspaper owned television station in a number of program particulars." *Order* at 1078 n. 26. However, the Commission did not stress this superiority in deciding to grandfather most stations. Comparing amounts of programming types aired, not only requires qualitative judgments in categorizing the programs, but would also seem to be a

---

54. *See Order* at 1093–94 for a listing.

55. We follow the Commission's categorization, even though, as the Commission recognized, the categories overlap. *Order* at 1072–73.

56. J. Anderson, Broadcast Stations and Newspapers: The Problem of Information Control: A Content Analysis of Local News Presentation, filed July 2, 1971, also published in J. Broadcasting 51 (1971).

57. *Id.* at 44–45. The study also finds that cross-owned television stations depend less heavily than individually owned stations on wire services for their stories. On this basis it concludes "newspaper-allied stations appear to be better recommended." *Id.* at 46. One commentator, however, suggests this phenomenon might be due to the fact that cross-owned stations rely heavily on their sister newspapers for information. Barnett, A Critique of, and Supplement to, the Prospective Reports of the Rand Corporation at 7 (Sept. 23, 1974).

58. Cox Broadcasting submitted studies similar to Anderson's dealing with markets in which it operates. W. McDougal & E. Sasser, Atlanta Market News and Editorial Research Study; J. Anderson & D. C. McDaniel, Two Studies: A Historical Analysis and A Content Comparison for Cox Broadcasting Corporation's Affiliated News Media in Dayton, Ohio (May 17, 1971).

59. G. Litwin & W. Wroth, The Effects of Common Ownership on Media Content and Influence (Aug. 4, 1969).

60. *Id.* at 1–1 to 1–2, 4–4.

61. *Id.* at 2–9.

62. *Order* at 1094 *et seq.*, appendix C.

crude measure of the public interest. More broadly, as Commissioner Robinson asserted in his dissent, it is inconsistent for newspapers to assert that they make superior broadcasters while at the same time claiming that their affiliated stations are totally independent. *Order* at 1119.

An empirical study which employed data drawn from the Commission's files attempts to determine if cross-owned stations differ from other stations in the amounts of news and other public interest programming they air.[63] According to the Commission, this study finds "no significant differences." A study by Harvey Levin [64] reaches the opposite conclusion. He finds that individually owned stations "systematically outclass" affiliated stations in their levels of public interest programming. However, several filings severely criticize Levin's methodology [65] and, although he later attempted to correct the deficiencies,[66] the Commission termed his results "inconclusive." *Order* at 1073.

Finally, the American Institute conducted a study to determine whether cross-ownership affects the level of public knowledge.[67] It finds the public in Zanesville, Ohio, a town with media "monopoly," significantly less informed than the public of a "similar" city, York, Pennsylvania, a town with a competitive media. The Institute attributes this difference to media monopoly. It is possible, however, that factors other than media monopoly contribute to or explain the results. In fact, this study highlights the difficulty of attempting to compare the performances of cross-and independently-owned stations. As Commissioner Robinson observed in his dissent:

> We ought not to assume that the kind of "goodness" we really want in a station is measured simply by diversity among different program types, the relative percentage of situation comedies, news, public affairs and the like. On the other hand, it is about the only way we can get any kind of objective handle on program quality, without getting into the business of making subjective valuations of programming content, a course that, needless to say, raises grave First Amendment problems.

*Order* at 1121.

(2) Effect of Common Ownership on Competition

Comparing advertising rates provides the most ready means for determining whether cross-ownership in general has an anti-competitive effect. Rosse *et al.*[68] purport to find that newspaper-owned television stations charge advertising rates 15% higher than other stations, presumably due to their monopoly position. However, their calculations assume that audience size lacks explanatory value because it is a "dependent variable"; in other words, they assume that since advertising prices determine programming quality which in turn determines audience size, audience size cannot explain advertising rates.

In a NAB-commissioned study, Lago and Osborne challenge this assumption.[69] Employing audience size as an explanatory variable in a regression analysis, this study finds no significant difference in advertis-

63. Comment of Students' FCC Study Group (May 17, 1971).

64. H. J. Levin, The Policy of Joint Ownership of Newspaper and TV Stations: Some Assumptions, Objectives and Effects (April 12, 1971).

65. National Association of Broadcasters Reply Comments and Arguments on the Proposed Rules, Appendices B, C and D (August 18, 1971).

66. H. Levin, Research Memorandum on the Economic and Programming Effects of Newspaper Ownership of Television Stations, Supplementary Comments at 4 (May 15, 1974).

67. American Institute for Political Communications, Washington, D.C., 1971, The Effects of Local Media on the Mass Mind. This study was never officially filed, although the Commission discussed it in the *Order* at 1073.

68. J. Rosse, B. Owen & D. Gery, Economic Issues in Joint Ownership of Newspaper and TV Media (June 1, 1970).

69. A. M. Lago & D. P. Osborne, A Quantitative Analysis of the Price Effects of Joint Mass Communications Media Ownership, RMC Report UR–150–A (March 9, 1971).

ing rates. The Commission did not indicate which methodology it accepted; it merely noted that its own examinations failed to confirm Rosse's conclusion.[70] *Order* at 1073.

Apart from these studies, the Commission noted that the record did not contain evidence of specific anti-competitive acts by cross-owned stations. However, Stephen Barnett suggested before the Commission that such evidence—as well as evidence regarding the impact of cross-ownership on station performance—is available, though difficult to uncover.[71] Pointing to examples from the Commission's cases, the Litwin and Wroth report[72] and other documented sources, Barnett described several instances where multiple-media owners had abused their power. Typical abuses were news suppression, news distortion and advertising discrimination that presumably would have been less feasible in a more competitive market.

The Commission did not mention these or other examples of abuses in its summary of the record,[73] although Commissioner Hooks noted that Barnett's position was supported by several other submissions. *Order* at 1109 (Hooks, Comm., concurring in part). The Commission's focus was on national trends, and it may have felt uncomfortable drawing conclusions about an entire industry from apparently isolated examples. However, former Commissioner Johnson has expressed the opinion that the majority of media abuses remain undiscovered. *In re National Broadcasting Co.*, 19 F.C.C.2d

713, 720–723 (dissenting opinion). In his view, this is caused by lack of written records, the difficulty of separating the elements of self-interest and news judgment, and the fact that station managers rarely resort to overt, documentable pressures.

(3) Multiplicity and Diversity of the Media

The record contains several studies designed to measure media diversity. Sterling's study reports that the proportion of newspaper-owned broadcast stations has declined since 1950.[74] However, it examines only the top 100 markets. Furthermore, it may understate the amount of current concentration. In gauging concentration, radio and television stations are equated even though the Commission had noted in its notice of proposed rulemaking that TV and newspapers are by far the most powerful media sources.[75] Thus the study would show that a town originally served only by a cross-owned television-newspaper combination had become significantly less concentrated by the addition of a radio station, even if the co-located combination remained the dominant voice. Udell's study reaches a conclusion similar to Sterling's. It finds that the percentage of newspaper-owned television stations dropped from 29% in 1955 to 14% in 1969.[76] This study may simply reflect, however, the fact that the number of broadcast outlets increased during this period while the number of newspapers decreased, a finding also made by Sterling.[77]

---

70. The nature of this examination is not clear from the record.

71. S. Barnett, reply comments (August 19, 1971); S. Barnett, "Cross-Ownership of Mass Media in the Same City: A Report to the John and Mary Markle Foundation" (Sept. 23, 1974). It is strenuously contended that the latter submission was not part of the administrative record and hence should not be considered on appeal. However, as much of the report consists of discussion of cases in the public record, we see no harm in taking notice of it.

72. *See* note 59 *supra*.

73. During the pendency of Docket 18110, the Commission deferred petitions to deny renewal applications alleging undue economic concen-

tration. The Justice Department had filed several such petitions. *Order* at 1080, n.29.

74. C. H. Sterling, Ownership Characteristics of Broadcasting Stations and Newspapers in the Top 100 Markets: 1922–1967 (March 5, 1971).

75. 22 F.C.C.2d at 346. The Litwin-Wroth study, *supra* n. 59, was one study that reached this conclusion. *See also* studies cited at 22 F.C.C.2d at 344.

76. J. Udell, Economic Consequences of FCC Proposal and Critique of Relevant Literature, submitted by the ANPA.

77. The NAB argues that it is unnecessary and hence arbitrary for the Commission to impose

The Seiden study attempts to measure precisely the amount of diversity in communities throughout the country.[78] Choosing the Area of Dominant Influence [79] as the relevant geographic area instead of either the city, country or Standard Metropolitan Statistical Area, it counts the number of media competitors and owners that serve each area and finds that no area is served by less than thirty media owners.[80] However, the count includes numerous media that have little or no bearing on local diversity, such as newspapers from other cities and national magazines. The count contains other distortions as well. A television station and its satellites are treated as individual outlets even though they provide the same service. The Commission characterized this study as "totally unrealistic." *Order* at 1079, n.28.

In concluding its discussion of these studies, the Commission expressed doubt as to whether "counts" as such generated valuable knowledge. *Order* at 1074. Also, the Commission's brief disparages the conclusion of the Justice Department brief that the media is highly concentrated in many cities. In thirty Standard Metropolitan Statistic Areas (SMSAs) involved in this case, Justice observes, only one newspaper circulates. "In twenty others there are only two daily newspapers, and in eleven of these the newspaper which owns a television station has more than 75% of the SMSA's newspaper circulation. Computed from Rand Corporation Study R–1585–MF." And, Justice continues, "metropolitan areas which in theory have several newspapers, in practice usually have only one or two with significant circulation." Br. at 20. Such figures, the Commission points out, do not establish that the broadcast industry is anti-competitive.

### (4) Economic Consequences of Divestiture

The economic consequences of divestiture involves two questions: the extent to which investors themselves will be injured and the extent to which this injury will be translated into public injury. Two major studies deal chiefly with the first question, none with the second.

Commissioned by the ANPA, the Frazer-Gross study [81] and the First National City Bank study [82] both suggest most combination owners will divest their television stations, at less than current value. In particular, Frazer estimates that under divestiture conditions, TV stations will sell at 10% to 20% less than true value. In response, Justice contends this conclusion is premised on the erroneous assumption that broadcast licensees do not compete in the investment market with other non-broadcast income-producing properties.[83] Furthermore, even assuming the validity of Frazer's judgment, it does not follow that the sales price will not include a substantial profit margin.[84]

---

restrictions on affiliations since market forces are eliminating whatever problem exists. This position is unpersuasive. First, since none of the studies demonstrates why cross-ownership has declined, continuation of the trend cannot be confidently predicted. Consequently, there is no way to predict how long it will take for cross-ownership to finally die out. More importantly, there is no reason why the Commission cannot act to accelerate a natural trend. And this argument has an ironic ring in light of the claims that divestiture would disrupt the continuity necessary for quality broadcasting.

**78.** N. H. Seiden & Associates, Mass Communications in the United States (Jan. 29, 1971).

**79.** The concept of the Area of Dominant Influence (ADI) was designed by the American Research Bureau to reflect advertising markets. Every county in the continental United States is assigned to one of 204 ADI's. Seiden, *supra* n.78, at 4. An ADI thus may encompass a large geographic area.

**80.** New York City showed 610 media outlets while Meridian, Mississippi, which the Commission characterized as an "egregious case," showed 109 media outlets.

**81.** Frazer, Gross Associates, Valuation of Newspaper Owned TV and Radio Stations.

**82.** First National City Bank, Financial and Investment Issues of Forced Divestiture.

**83.** Comments of the United States Department of Justice, pp. 32–33 (1971).

**84.** The Commission evidently assumed that the forced sales would be accomplished at a gain.

Finally, since investment demand and license demand may fluctuate during the five year sale period, it is difficult to forecast loss figures accurately. The Commission concluded, "Our own evaluation is that the concern [over losses] may be exaggerated." *Order* at 1072.

No studies dealt with whether the public would be injured by the economic consequences of divestiture. Various comments, however, predict divestiture will produce harmful side-effects such as reductions in local ownership or the demise of marginally profitable newspapers contrary to the intent of the Newspaper Preservation Act.[85] Such suggestions are little more than speculations.[86]

B. *Whether the Commission May Properly Require a Showing of Tangible Harm to Support Divestiture*

Putting aside for the moment the question whether the Commission abused its discretion in refusing to order divestiture absent a showing of tangible public interest harm, we first consider whether the Commission's evaluation of the record was reasonable.

Despite the fact that it did not systematically evaluate the record, the Commission evidently concluded that the factual case for broad-scale divestiture had not been made. At one point the *Order* implies that the Justice Department failed to demonstrate that cross-owned stations charged anti-competitive advertising rates, *Order* at 1079 n. 27, and later it observes "it might have been necessary . . . to require divestiture in many more situations if the power of the print-broadcast combination were exercised monolithically." *Order* at 1089. Also, after mentioning its power to act in the absence of documented abuses, the Commission nonetheless concluded that such "considerations are [not] a substitute

for the requirement of a stronger showing than we have of the need for such a severe remedy on a broad basis." *Order* at 1080, n.29.

Furthermore, the Commission reasonably could have concluded, as it evidently did, that a compelling factual showing was unlikely to be made. The Commission not only received roughly 200 original submissions, but, when dissatisfied with the substantially of these filings, there were 48 fresh filings in response to a detailed request. 45 F.C.C.2d 768. As a whole, the submissions suffered from what may have been unavoidable failings.[87] Diversity and its effects are, as Commissioner Robinson suggested, elusive concepts, not easily defined let alone measured without making qualitative judgments objectionable on both policy and First Amendment grounds. And the process suggested by Professor Barnett's filing did not offer much more hope of compiling a useful record. Former Commissioner Johnson has suggested that specific abuses of cross-ownership are unlikely to be apparent. And, as Judge Tamm has explained elsewhere, documentation of such abuses, "would require not only program monitoring but also laborious perusal of reams of documentary evidence which will likely be dispersed, inaccessible and unintelligible to one who is not skilled in the intricacies of antitrust and communications law." *Hale v. FCC*, 138 U.S.App.D.C. 125, 425 F.2d 556, 565 (1970) (Tamm, J., concurring). Furthermore, the intrusiveness involved in the very process of attempting to uncover abuses—such as news distortion—might severely strain First Amendment values.

On the other hand, the *Order* does not emphasize that the record does not support the reasons adduced for grandfathering either. There is virtually no evidence regarding the likelihood that divestiture would

---

The Commission offered to certify sales for special treatment under 26 U.S.C. § 1071, *Order* at 1025, n.45, a provision only applicable to gains.

85. P.L. 91–353, 84 Stat. 466 (1970).

86. *See* text and notes at notes 94–104 *infra.*

87. An antitrust rather than First Amendment focus might have facilitated compilation of a useful record. This does not, however, invalidate the Commission's chosen emphasis.

produce the harmful effects feared, or how serious any such harm would be. And the record no more establishes that cross-ownership serves the public interest than injures it.[88] After years of study, the record was essentially inconclusive.[89]

Had the evidence pointed strongly one way or another, the Commission probably would not have considered whether it should order divestiture absent a showing of tangible harm. Having concluded that the record was inconclusive, the Commission recognized that it nonetheless had the power to order divestiture. *Order* at 1080, n.29. Had the Commission reasoned that because diversified ownership is prima facie in the public interest, local cross-ownership violates the public interest, it would have been rational for it to conclude that divestiture was generally called for, subject to any appropriate exceptions. The Commission did not adopt this view, however.[90] "Divestiture," the Commission wrote, "is a harsh remedy, one to be reserved [sic] only where the need is overwhelming and the evidence unambiguous."[91] *Id.* at 1083. Thus the question before us is whether the Commission acted properly in refusing to order divestiture in the absence of a showing of tangible public interest harm.

■ Having evaluated the policies and record presented to us, we hold that the Commission erred in concluding that the other policies it advanced required it to find evidence of harm before ordering divestiture. Divestiture, to begin with, is a misleading term in this context. It implies that the broadcaster has that which the Communications Act specifically states he does not have—an interest in the license beyond its expiration date—and that he is being forcibly deprived of a vested right. A licensee must apply for renewal of his license every three years and the Commission is to grant renewal only if it finds it is in the public interest to do so. 47 U.S.C. § 307(d).

With this in mind, it is easier to understand that even though divestiture is typically a remedy for misconduct, it is actually a much more flexible tool. Divestiture need not only be used to take the licenses from those who disserve the public interest. As with the Commission's early Chain Broadcasting and Multiple Ownership rules,[92] divestiture could be employed *to increase* the extent to which the broadcasting industry serves the public interest. As the Commission recognized, "it is unrealistic to expect true diversity from a commonly owned station-newspaper combination. The divergency of their viewpoints cannot be expected to be the same as if they were antagonistically run." *Order* at 1079–80. Although divestiture cannot guarantee greater diversity, it increases the likelihood that the public will be served by broadcasters with diverse views. Thus the Commission's obligation to "encourage the *larger*

---

**88.** One attempt to assess statistical studies on the effects of media concentration concluded neither side in Docket 18110 had adduced sufficient quantitative evidence to completely "prove" its case for harm or benefit. Bear, Geller, Grundfest & Posner, *Concentration of Mass Media Ownership* (RAND, Sept. 1974) at 79.

**89.** The Commission evidently shares this assessment. In its brief it observes that most of the studies were inconclusive. Br. at 9, n. 6. The firmest conclusion drawn by the Commission was that an "overwhelming need" for divestiture had not been shown. The Commission did not point to items in the record that supported its decision to grandfather most stations.

**90.** The most natural reading of the Commission's *Order* is that the burden of persuasion was placed on the proponents of divestiture. A strained, though possible, reading is that the burden placed on the opponents was met by the mere existence of competing policies. However, as will be shown, *see* text and notes at notes 108–109 *infra*, the record contains no evidence anchoring the competing policies to the grandfathered combinations. Thus it would have been unreasonable to conclude the presumption against cross-affiliation had been met.

**91.** Although this premise, if valid, would have supported some form of limited divestiture, it would not have supported the limited divestiture actually ordered. That is because no evidence supports the line drawn by the Commission. *See* text and notes at notes 108–09 *infra*.

**92.** *See* text and notes at notes 6–8 *supra*.

and *more* effective use of radio in the public interest," 47 U.S.C. § 303(g) would support the presumption that cross-owned stations do not serve the public interest.

 The policies of the First Amendment also support this presumption. Because the right of access to the airwaves of some would-be broadcasters has been restricted, the public is deprived of speakers it would otherwise hear. As a result, the Supreme Court has said "[i]t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount." *Red Lion, supra,* 395 U.S. at 390, 89 S.Ct at 1806. And the interest of the public is presumed to be in maximum diversification of the airwaves. The First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be folly; but we have staked upon it our all." *Associated Press v. United States,* 52 F.Supp. 362, 372 (D.C. 1943).

Finally, and perhaps most importantly, the Commission's long-standing policy has been that diversification of media sources is of central importance.[93] It reaffirmed this view throughout the proceeding under review. "If our democratic society is to function, *nothing* can be more important than insuring that there is a free flow of information from as many divergent sources as possible." *Order* at 1079 (emphasis added). Of course, the Commission probably did not intend for this and similar statements to be read literally. If it had, it presumably would not have allowed itself even to consider whether other policies ever called for waiver. But at the least, consistency would

call for ordering divestiture absent a showing of greater public interest harm.

The Commission did not do this, however. Although purporting to reaffirm the primacy of diversity, *e. g., Order* at 1078, the *Order* ultimately did not adopt the presumption that cross-ownership does not serve the public interest, divestiture only being ordered where "the need is overwhelming and the evidence unambiguous." *Order* at 1083. The Commission never explained that or why it had abandoned the presumption suggested in the notice of proposed rulemaking. It simply cited the existence of competing policies it claimed not to have previously considered.

The first competing value is preservation of local ownership and involvement of ownership in management. The Commission expressed fear that "many sales would have to be to outside interests." *Order* at 1078. However, as the *Policy Statement on Comparative Broadcast Hearings,* 1 F.C.C.2d 393, 395–96 (1965), makes clear, local ownership by itself is of little concern to the Commission.[94] Owner management is significant because it increases the likelihood that station policy will be attuned to local needs; local ownership by itself offers no such promise.[95] And even when both are present, they are not of primary importance to the Commission. A licensee may sell its license without regard to whether the new owner intends to participate actively in management. Br. of Justice Dept. at 39, F.C.C. Reply Br. at 19 n.15.

In addition, the record does not support the theory that divestiture will impair local ownership and management. The Justice Department asserts and the Commission does not deny that nineteen, or roughly one quarter of the 79 newspaper-television com-

---

**93.** *See* text and notes at notes 6–9 *supra.*

**94.** Although by its terms the 1965 *Policy Statement* applies only to comparative renewal hearings, the Commission has regarded it as an expression of general policy. *See* note 9 *supra.*
 *See also, Community Broadcasting Service, Inc. v. FCC,* 2 FCC2d 53 (Rev.Bd., 1966), *aff'd, Community Broadcasting Service, Inc. v. FCC,* 126 U.S.App.D.C. 258, 377 F.2d 143 (1967); *Mid-Florida Television Corp.,* 33 FCC2d 559 (Rev.Bd.), *aff'd* 37 FCC2d 559 (1972), *rev'd on*

*other grounds, TV 9 Inc. v. FCC,* 161 U.S.App. D.C. 349, 495 F.2d 929 (1973), *cert. denied* 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

**95.** "We are primarily interested in full-time participation. To the extent that the time spent moves away from full time, the credit will drop sharply, and no credit will be given to the participation of any person who will not devote to the station substantial amounts of time on a daily basis." 1965 *Policy Statement, supra,* 1 FCC2d at 395.

binations at issue, are not locally owned. In those cases divestiture may spark improvement. Furthermore, no evidence was presented that the local owners of the other stations are actively involved in daily management. Since "[m]ost of the parties state that their broadcast stations and newspapers have separate management, facilities, and staff . . . " *Order* at 1059, it may be that owner management is unusual. Finally, there is no reason to suppose that local entrepreneurs will not find television an attractive investment.[96]

The second fear is that divestiture might disturb "continuity of operation . . . as the new owner would lack the long knowledge of the community and would have to begin raw." *Order* at 1078. As support, the Commission brief cites judicial decisions giving recognition to the fact that "legitimate renewal expectancies are implied in the structure of the Communications Act" Rep.Br. at 15. The goal of certainty is to give broadcasters an incentive to make the investment required to produce quality programming. Whatever the legitimate strength of this policy in light of the statutory limitation on the interest in a license,[97] it has scant force in this case. A

one-time alteration in the ownership structure of the broadcast industry should not effect the public's interest in quality programming because the new owners will become the beneficiaries of any unofficial policy of continuity.[98] Furthermore, to the extent the Commission means that transfer of ownership is by itself disruptive, its position is at odds with its practice of routinely approving license assignments.[99] Finally, even if transfer to non-local owners entails extraordinary disruption, there is no basis for assuming that such transfers will result from divestiture.[100]

The final fear is that "[l]ocal economic dislocations are also possible as a result of the vast demand for equity capital and wide-scale divestiture could increase interest rates and affect selling price too." *Order* at 1083. Although it is not entirely clear, the Commission presumably was not concerned with financial hardship to the individual owners.[101] Private losses are a relevant concern under the Communications Act only when shown to have an adverse effect on the provision of broadcasting service to the public. *Federal Communications Commission v. Sanders Radio Station*, 309

**96.** *See* text accompanying note 102 *infra*. An argument evidently rejected by the Commission is that because large stations are so expensive, divested stations would be purchased primarily by group owners who would thereby accumulate undue power. It is not clear that this chain of events would transpire. And in any event, non-concentrated group ownership might constitute an effective bulwark against the power of the networks. *See Bazelon, FCC Regulation of the Telecommunications Press*, 1975 Duke L.Rev. 213, 238.

**97.** "No such license shall be construed to create any use beyond the terms, conditions and period of the license." 47 U.S.C. § 301. *See Fidelity Television, Inc. v. FCC*, 169 U.S.App. D.C. 225, 515 F.2d 684, 705 (Bazelon, C. J., statement as to why he voted to grant rehearing en banc), (1975).

**98.** Of course, the public interest would be affected if the old licensees were "better" than their replacements. But the Commission cites no reason to believe that the new licensees will, in the long run, be inferior.

**99.** There is some dispute regarding the number of transfers routinely approved by the Commission. Justice asserts that in the six years prior

to the *Order*, the Commission approved without hearing 678 license assignments. Br. at 42. The Commission replies that almost 60% of these were pro forma assignments, such as "transfers to relations because of death, minority stock." Rep. Br. 18. Even assuming that such transfers are inconsequential, the number of other transfers suggests that "disruption" is not ordinarily a major concern for the Commission.

**100.** Commissioner Robinson pointed out that holdovers in high-level management often smooth the transition period. "Indeed, any other action by the new licensee would only reduce the value of his franchise." *Order* at 1128.

**101.** There are, however, passages that suggest that this was the Commission's concern. "[D]ivestiture introduces the possibility of . . . hardship for individual owners." *Order* at 1078. In addition, the *Order* suggests that because some combinations were formed when broadcasting was not profitable, it would be unfair to deny continued operation to those owners now that it is. To the extent such a policy underlies the Commission's decision, it is impermissible. Licensing is to be in the public, not private interest.

U.S. 470, 474–76, 60 S.Ct. 603, 84 L.Ed. 869 (1940); *Carroll Broadcasting v. F.C.C..*, 103 U.S.App.D.C. 346, 258 F.2d 440 (1958). Yet, as Commissioner Robinson theorized in his dissent, *Order* at 1127, divestiture should not even produce substantial *private* losses. Most cross-owned stations are held by their original owners who by now have long recouped their original investment. *Order* at 1130.[102]

In its brief, the Commission claims that its concern was the effect divestiture would have on future programming. It reasoned that because broadcasting stations are expensive, new owners would have insufficient working capital to finance news and other public affairs programming. Rep.Br. at 20. But presumably this would also be the case in voluntary transactions, which the Commission readily permits. A different public interest injury that might result from separation is the failing of marginal newspapers no longer supported by affiliated broadcast stations.[103] However, the Commission did not rely on this point and,

as Commissioner Robinson pointed out, the record contains no reliable information on the degree to which stations subsidize newspapers. *Order* at 1129.[104]

In sum, the Commission could not have rationally concluded that the competing policies it offered justified grandfathering absent a show of harm. And, since the record does not disclose the extent to which divestiture would actually threaten these values, the Commission could not have rationally concluded, if it did, that their potential impairment overcame the presumption against cross-ownership.[105] The gains in diversity from divestiture may be speculative, but since divestiture is the most promising method for increasing diversity that does not entail governmental supervision of speech,[106] the Commission could not rationally conclude that lesser policies, lacking support in the record, require maintenance of the status quo.[107] "In passing upon considerations open to the Commission even on an application for renewal of a license this

---

**102.** Commissioner Robinson noted that some more recently formed combinations might not have yet returned their original investment. With respect to these, he concluded, "I am unwilling to assume that the public interest compels us to ratify the licensee's expectation that its three-year license constitutes a perpetuity which should not be revoked when other, and weighty, public interest considerations may require it." *Order* at 1130.

**103.** It is often assumed that the demise of the *Boston Herald* was caused by the revocation of the license of its wholly owned subsidiary, WHDH TV. *Order* at 1107 (Lee, R., Comm., concurring).

**104.** Furthermore, if it appeared likely that a newspaper would fail as a result of divestiture, the Commission could reasonably conclude that the public interest called for waiver. *See International Shoe Co. v. FTC*, 280 U.S. 291, 302–303, 50 S.Ct. 89, 74 L.Ed. 431 (1930).

**105.** *Cf. Terre Haute Broadcasting Co.*, 25 FCC2d 348, 353–55 (1970); *Policy Statement on Comparative Broadcast Hearing*, 1 FCC2d 393, 394 (1965). *See WHDH, Inc.*, 16 FCC2d 1, 12–13 on recon., 17 FCC2d 856 (1969), *aff'd Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841, 859–60 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *Lorain Community Broadcasting Co.*, 13 FCC2d 106, 114, recon. denied,

14 FCC2d 604, rehearing denied, 15 FCC2d 388 (1968), review denied, 18 FCC2d 686 (1969), *aff'd, Allied Broadcasting, Inc. v. FCC*, 140 U.S. App.D.C. 264, 435 F.2d 68, 69 (1970); *Ultravision Broadcasting Corp.*, 11 F.C.C.2d 394, 410–11 (1968), *aff'd WEBR, Inc. v. FCC*, 136 U.S. App.D.C. 316, 420 F.2d 158 (1969). *See generally TV 9, Inc. v. FCC*, 161 U.S.App.D.C. 349, 495 F.2d 929, 938 (1973), *cert. denied*, 419 U.S. 986, 95 S.Ct. 245, 42 L.Ed.2d 194 (1974).

**106.** *See* text accompanying notes 30–32 *supra*.

**107.** Justice offers as a separate grounds for reversal the Commission's failure to accord greater weight to antitrust considerations, particularly competition for advertising revenues. Although antitrust policy is relevant to the "public interest, convenience, or necessity" standard, as the Commission recognized it is only one component of a broader mandate. *Order* at 1079. *United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *Northern Natural Gas Co. v. FPC*, 130 U.S.App.D.C. 220, 399 F.2d 953 (1968). In deference to the strong authority in support of this proposition, Justice now claims the Commission should have given the antitrust laws "prima facie effect." However, the Commission was well within its discretion in rejecting Justice's suggestion, regardless of its label.

court has taken a stand against heavy reliance upon maintenance of the status quo." *TV 9, Inc. v. F.C.C*, 161 U.S.App.D.C. 349, 495 F.2d 929, 937 (1973).[108]

In any event, even if the Commission's chosen presumption were supportable, its current policy could not stand. First, the record does not support the conclusion that divestiture would be more harmful in the grandfathered markets than in the 16 affected markets. Nor does it show that the need for divestiture in the affected markets is "overwhelming" and the evidence "unambiguous." Although the affected markets contain fewer voices, the amount of diversity in communities with additional independent voices may in fact be no greater. The Commission "must do more than enumerate factual differences, . . . it must explain the relevance of those differences to the purposes of the Federal Communication Act." *Melody Music v. F.C.C.*, 120 U.S.App. D.C. 241, 345 F.2d 730, 733 (1965).

Finally, limiting divestiture to small markets of "absolute monopoly" squanders the opportunity where divestiture might do the most good. There is no apparent technological reason why additional broadcasters could not be licensed in many of the smaller markets.[109] In many large markets, on the other hand, newspapers possess highly coveted VHF licenses.[110] Divestiture thus may be more useful in the larger markets. The Commission's arbitrary cut-off at one independent in-coming signal prevents realization of such gains.[111]

*Conclusion*

Although we do not disturb the Commission's prospective rules, we conclude that the divestiture order is inconsistent with its longstanding policy that "nothing can be more important than insuring that there is a free flow of information from as many divergent sources as possible." The Commission has sought to limit divestiture to cases where the evidence discloses that cross-ownership clearly harms the public interest. For the reasons expressed above, we believe precisely the opposite presumption is compelled, and that divestiture is required except in those cases where the evidence clearly discloses that cross-ownership is in the public interest.[112] Accordingly, we vacate such portions of the *Order* that have retroactive effect and remand the

108. The *Order* not only leaves the status quo largely intact, it solidifies the position of existing combinations by making petitions to deny more difficult. Without reasoned discussion, the Commission has abandoned its former policy of allowing petitioners to deny the opportunity to demonstrate in any one of several ways that cross-ownership harms the public interest. *See* note 21, *supra*. The Commission's decision to substitute an antitrust standard for this open-ended test is inconsistent with the *Order's* emphasis on First Amendment considerations. Furthermore, it unreasonably curtails the interests of petitioners to deny. The Commission's decision to grandfather as the rule rather than the exception was based largely on its conclusion that the rulemaking record did not contain evidence documenting the harmful nature of cross-ownership as a general matter. Had this policy been supportable, it would have been logical for the Commission to encourage showings of harm in individual markets, rather than effectively to prohibit it. In fact, the Commission itself seems to recognize the deficiencies of this standard. The Commission recently set for hearing the renewal of WGAL–TV, exclusively on the issue of cross-ownership "abuses" that do not constitute violations of the antitrust laws. Renewal of WGAL–TV, 39 RR2d 457 (1976). In passing, the Commission noted that it has neither the "expertise" or "experience" to enforce the antitrust laws and that it would be "inappropriate" for it to duplicate the functions of those agencies that are expert, *id.* at 463.

109. Because of geographic proximity, the Commission cannot always assign the maximum number of frequencies to each city.

110. "Currently, nearly every available VHF frequency is assigned and in use, . . . ." Federal Regulation and Regulatory Reform, Report of the Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, 94th Cong., 2d Sess., Dec. 6, 1976.

111. This is not to say that the Commission's focus on local news was improper. That focus seems entirely appropriate in light of the number of media voices concerned with national affairs.

112. Such cases could be accommodated through a waiver procedure. The *Order* contains an excellent discussion of the circumstances in which such waivers might be appropriate. *See Order* at 1085.

record to the Commission for adoption of a rule not inconsistent with this opinion.

*It is so ordered.*