555 F.2d 967
 181 U.S.App.D.C. 30, 2 Media L. Rep. 1763
 NATIONAL CITIZENS COMMITTEE FOR BROADCASTING, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Elyria-Lorain Broadcasting Co. et al., Intervenors.
OWOSSO BROADCASTING COMPANY, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
WJAG, Inc., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
WHAS, Inc., et al., Intervenors.
The OGDEN NEWSPAPERS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
DAILY TELEGRAPH PRINTING COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
WHAS, Inc., et al., Intervenors.
The OGDEN NEWSPAPERS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
AMERICAN NEWSPAPER PUBLISHERS ASSOCIATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
The BROCKWAY COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
GRAY COMMUNICATIONS SYSTEMS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
KSL, Inc., Intervenor.
 Nos. 75-1064, 75-1152, 75-1289, 75-1379, 75-1386 to 75-1388,
75-1567, 75-1614 and 75-1618.
 United States Court of Appeals,
District of Columbia Circuit.
 April 5, 1977.
 
 On Motion for Stay of Mandate.
 Before BAZELON, Chief Judge, and WRIGHT and ROBINSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 Before us is a motion filed by the Federal Communications Commission to stay the mandate to be issued by this court pursuant to its opinion and order on the merits of this case. The Commission suggests that immediate compliance with portions of our mandate would impose a "substantial burden" on its resources. Since the Commission is moving quickly to petition the Supreme Court for a writ of certiorari in this case, it asserts that such a burden ought not be required until the Supreme Court can act on its petition. The National Association of Broadcasters (NAB) supports the Commission's motion, arguing that immediate issuance of our mandate will require NAB's members to begin costly efforts leading to divestiture. The Department of Justice does not oppose the motion, but does not actively support it either. The National Citizens Committee for Broadcasting (NCCB) opposes the motion insofar as it would reinstate the requirement that petitioners to deny individual license renewal applications allege a Sherman Act section 2 violation as a precondition for a hearing on the question of undue economic concentration. NCCB would also have us stay that part of our order which vacates Commission orders requiring divestiture in 16 so-called "egregious" cases. It is not clear, however, that NCCB or anyone else will seek further review of this segment of our opinion.
 
 
 2
 Before ruling on these motions, it is important to review the salient points of our March 1 opinion. By its order in the cross-ownership case, the Commission divided its regulatory province into three parts. New broadcast licenses would not be issued to any applicant which also owned a newspaper co-located with the proposed broadcast station's area of license. Present co-located newspaper-broadcast combinations, with 16 exceptions, were grandfathered and, in addition, the Commission took the view that further challenges to the renewal of these stations' licenses would have to meet tougher threshold requirements. Divestiture was ordered only where the sole broadcast station in a locality was owned by the sole daily newspaper in the same locality.
 
 
 3
 The gist of our opinion is that the lines thus drawn between future and present co-located combinations and between the 16 egregious cases and all other present co-located combinations were arbitrary and capricious. We first indicated that the Commission had authority to promulgate its prospective rules even though the record was inconclusive on the question whether actual "abuses" flowed from newspaper-broadcast cross-ownership. We agreed with the Commission that long-established principles indicated that it could act to increase the diversity of broadcast media voices even when there was no evidence that a lack of diversity was producing harmful side effects. We recognized that the Commission had consistently acted on this principle and had received the approval of the courts (including the Supreme Court on a number of occasions) for this policy approach. Indeed, in its instant motion, the Commission has not asked us to stay our mandate insofar as it approves the prospective cross-ownership rules. Thus now as in its defense on the merits, the Commission apparently asserts its authority and intention to act to increase diversity even though it has created no record of actual abuses stemming from cross-ownership.
 
 
 4
 Having asserted its authority and intention to act in this way with respect to applications for new licenses, however, the Commission insisted that it was required to find actual evidence of abuses before it could order divestiture of presently co-located facilities. The Commission itself recognized that such a shift of position had to be justified by reference to factors differentiating present from future licensees. One factor suggested was harm to the public interest in terms of a reduction in the quality of broadcast programming, but the Commission correctly found no record support for any such proposition. The Commission did assert policies competing with enhancement of diversity as support for its shift of emphasis, but on analysis we found that in the past these policies had consistently been given lesser weight than increased diversity and further that these policies if consistently applied in the future would require massive shifts in the practice of the Commission with respect to license transfers. We further found that the distinct treatment of the 16 egregious cases was invalid under the Commission's announced divestiture rule since the record contained no evidence that justified their disparate treatment.
 
 
 5
 Thus, "(h)aving evaluated the policies and record presented to us, we (held) that the Commission erred in concluding that the other policies it advanced required it to find evidence of harm before ordering divestiture." --- U.S.App.D.C. ----, 555 F.2d at 962, slip op. at 50. In summarizing this holding, we said, "The Commission has sought to limit divestiture to cases where the evidence clearly discloses that cross-ownership harms the public interest." Id., --- U.S.App.D.C. ----, 555 F.2d at 966, at 60. And, we continued:
 
 
 6
 For the reasons expressed above, we believe precisely the opposite presumption is compelled, and that divestiture is required except in those cases where the evidence clearly discloses that cross-ownership is in the public interest.
 
 
 7
 This final sentence is part of the summary of our holding that the retroactive rules are invalid, and its purpose was to indicate that the presumption upon which the Commission acted rendered the divestiture rule invalid. Nothing in our opinion supports a contrary conclusion.
 
 
 8
 Thus we were faced with a situation in which the Commission had treated three indistinguishable groups very differently. Because of this, steps had to be taken to restore consistent administrative treatment. Since the only consistent and court-approved policy in this field was that which we approved in affirming the Commission's prospective rules, and because no valid reasons had been given by the Commission for departing from this policy of giving diversity of media ownership controlling weight, we ordered the Commission to take further steps to ensure that everyone would be consistently treated under the standard already adopted for new license applicants (subject, of course, to an appropriate waiver procedure, which we also ordered the Commission to adopt, but which it had already indicated would be available with respect to the egregious 16).
 
 
 9
 Against this background, it should be plain that staying our mandate in this case would, pro tanto, sanction inconsistent treatment of licensees. On the other hand, the Commission warrants that it wishes to file for review of our decision as quickly as possible, but that absent a stay it will incur substantial burdens, which could conceivably impede that effort. On consideration of these competing factors, we are persuaded to stay our mandate, only insofar as it applies to the Commission's grandfathering rules, until April 22, 1977, on the understanding that the Commission will have filed for certiorari by that date.
 
 
 10
 So ordered.